**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

DARIUS JUAN BLOOMER,           )
                               )
              Plaintiff,       )
                               )
-vs-                           )       Case No.  CIV-06-850-F
                               )
UNITED PARCEL SERVICE, INC.,   )
                               )
              Defendant.       )

# O R D E R

Before the court is the defendant, United Parcel Service, Inc.'s Motion for
Summary Judgment, filed on June 29, 2007 (doc. no. 42).  The plaintiff, Darius Juan
Bloomer, has responded to the motion, and the defendant has thereto replied.  Upon
due consideration of the parties' submissions, the court makes its determination.

Background

Plaintiff commenced this action on August 14, 2006.  In the First Amended
Complaint filed October 13, 2006, plaintiff alleges a claim against defendant under
42 U.S.C. § 1981 for retaliation.  He also alleges a claim against defendant for
retaliatory discharge in violation of the Oklahoma Workers' Compensation Act, 85
O.S. 2001 § 5(A).  In its motion, defendant seeks summary judgment on both of
plaintiff's claims.

Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be
granted if the record shows that, "there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a matter of law."  The moving party
has the burden of showing the absence of a genuine issue of material fact.  Celotex

Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial.  Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Relevant Facts

Viewed in a light most favorable to plaintiff, the relevant facts are as follows. Plaintiff, an African-American male, is a former employee of defendant.  He worked for defendant from July, 1988 until April, 2005.  At all times relevant to this action, plaintiff was employed by defendant as a package car driver and assigned to its Edmond Center.  The plaintiff, in that position, was responsible for the pick up and delivery of packages for defendant's customers.  During his employment, plaintiff was a member of Local 886 of the International Brotherhood of Teamsters.  Plaintiff's employment was governed by a collective bargaining agreement.

On September 28, 1999, plaintiff filed a lawsuit in this court against defendant alleging claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., ("Title VII"), 42 U.S.C. § 1981, the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*., and Oklahoma law.  Plaintiff's claims of race discrimination and retaliation under Title VII and § 1981 with respect to plaintiff's May 17, 1999 termination (which was later reduced to a suspension of approximately five weeks) were tried to a jury in September of 2002.  The undersigned presided over the trial. Fifteen package car drivers employed by defendant were subpoenaed to testify at

plaintiff's trial and consequently had to miss work.  After four days of testimony, the jury returned a verdict in favor of defendant.

During the September 2002 trial, plaintiff was off work due to a work-related injury to his right shoulder.  Plaintiff did not return to work until released to do so in early January, 2003.   On January 3, 2003, Brian Schmidt ("Schmidt"), one of plaintiff's supervisors, conducted an annual certification safety ride with plaintiff to observe plaintiff's work methods and provide additional training.  During the ride, Schmidt noted eight of approximately eighty safe work methods established by defendant that plaintiff had not followed.  These included failing to fasten the seat belt, failing to use proper lifting techniques, failing to grasp packages properly, and running.  Schmidt gave specific instructions to plaintiff regarding the safe work methods plaintiff had not followed and had plaintiff sign off on the Safe Work Methods Training form, dated January 10, 2003, documenting the instructions.

In February of 2003, plaintiff reported an injury to his back.  After his return to work, Schmidt conducted a follow-up safety ride.   Schmidt noted eight of approximately eighty safe work methods plaintiff did not follow, including failing to use proper lifting and gripping techniques, failing to pivot, failing to use hand rails and failing to use a three-point stance.  Plaintiff signed off on the Safe Work Methods Training form dated February 24, 2003.

On April 3, 2003, new Edmond Center manager, Rick Ross ("Ross"), allegedly observed plaintiff not putting on a seat belt until half way across a parking lot.  Ross followed plaintiff and purportedly observed him violate certain safety work methods.  Ross approached plaintiff the following Monday, April 7, 2003, and advised plaintiff of what he observed.  Plaintiff denied any wrongdoing.  Plaintiff declined to sign off on his Employee Record-2003, which documented Ross' observations.  Prompted by

his union steward to acknowledge the discussion, plaintiff signed off on the Employee Record-2003.

On April 11, 2003, Ross and Dale Callicoat ("Callicoat"), another of plaintiff's supervisors, conducted an on-area observation of plaintiff. They purportedly observed various safe work and driving methods violations. Ross met with plaintiff on April 14, 2003 to review the observations and plaintiff denied any wrongdoing. Ross required plaintiff to participate in another safety ride that day. He also advised plaintiff that he was being issued a warning letter for violating safe work methods and a warning letter for violating safe driving methods. A warning letter dated April 21, 2003 indicated that on April 11, 2003, plaintiff was driving without wearing a seatbelt, not using turn signals, turning into the wrong lane and not using the horn when backing. The other warning letter also dated April 21, 2003 indicated that on April 11, 2003, plaintiff was observed running and jumping on and off the package car without using a hand hold to get on and off the car.

Schmidt conducted the safety ride on April 14, 2003. He noted four violations of the safe work methods. He instructed plaintiff on grasping, pivoting, getting close and lifting techniques. On the Safe Work Methods Training form, Schmidt recommended continued on-area observations but indicated that plaintiff demonstrated a much better use of safe work methods.

Although released to work in January 2003, plaintiff was required to visit a court-appointed physician, Dr. Janssen, for regular on-going treatment for his right shoulder injury. According to the collective bargaining agreement, defendant was required to compensate plaintiff at the regular hourly rate of pay for that time. Defendant denied plaintiff's requests to be off for the scheduled appointments. Plaintiff nonetheless attended the appointments. Defendant did not compensate plaintiff for the time off. On April 28, 2003, plaintiff filed a grievance seeking

compensation for the time off for his appointments on January 9, March 14 and April 25 of 2003. In the Pre-hearing Information form received by the union on May 1, 2003, a back pay claim of 2.5 hours for each occurrence or a total of 7.5 hours was made. The grievance was resolved with defendant agreeing to pay two hours for each doctor's appointment or a total of six hours and defendant agreeing to pay more if plaintiff could prove the additional amount of time spent at doctor's appointment.

On May 16, 2003, Ross and Callicoat conducted another on-area observation of plaintiff. They allegedly observed plaintiff failing to comply with certain safe work and driving methods, including not using his seat belt, turning into the wrong lane, rolling a stop sign, rolling a red light, not using hand hold, and running. Ross suspended plaintiff for one day without pay. Plaintiff served the suspension without filing a grievance.

On June 19, 2003, plaintiff filed a grievance for the denial of his request to be off for his court-ordered physician appointment on June 20, 2003.

On June 25, 2003, Schmidt issued a warning letter to plaintiff for not recording a package. According to plaintiff, the package was not delivered by him.

On July 14, 2003, the grievance filed on June 19, 2003 was resolved in plaintiff's favor. Several days later, on July 21, 2003, plaintiff spoke with Ross regarding the physician appointments. During their conversation, Ross stated that plaintiff was rude and insubordinate. A warning letter was subsequently issued to plaintiff on July 30, 2003 stating that plaintiff was rude and insubordinate to his management team.

On July 17, 2003, plaintiff had a single-vehicle accident. Ross conducted a follow-up safety ride with plaintiff on July 18, 2003. He allegedly observed plaintiff violating 5 of approximately 80 safe work methods and 11 of approximately 115 safe driving methods. According to Ross, plaintiff could not verbalize specific lists of

safety "habits" and safe work methods.  Ross worked with plaintiff during the day on those lists and provided plaintiff with a copy of the safe work methods.

Ross judged plaintiff's July 17 accident to be avoidable and issued plaintiff an intent to terminate, also called a "working termination" on July 30, 2003.  With such discipline, plaintiff was allowed to continue working as a package car driver until the grievance process, pursuant to the collective bargaining agreement, was exhausted.  Through the grievance process at the local level, the intent to terminate was reduced to a warning letter.

On August 20, 2003, Ross and Chris Calvert ("Calvert"), another of plaintiff's supervisors, conducted an on-area observation of plaintiff.  They purportedly observed plaintiff drive his package car without his seat belt, run a red light, leave the back door of his car open at a stop and while driving, drive while talking on cell phone, park on the wrong side of the street, running and talking on his cell phone while exiting his package car carrying a large package.  When he returned to the Edmond Center, Ross advised plaintiff he was being terminated for violating multiple safe work methods.  Plaintiff received two termination letters both dated August 26, 2003.  One of the letters stated that plaintiff was terminated for failing to follow safe driving methods and the other stated that plaintiff was terminated for failing to follow safe work methods.

Two days prior to his termination, plaintiff was given the go-ahead for surgery on his right shoulder, pending notice and approval by defendant.

Plaintiff filed a grievance over his termination.  Defendant and the union were unable to reach a compromise at the local level or at the subsequent grievance panel[1] hearing.  Pursuant to the collective bargaining agreement, plaintiff's grievance

---

[1] In compliance with the collective bargaining agreement, this panel is comprised of three representatives of defendant and three representatives of the union.

progressed to a deadlock panel made up of two representatives, one each from defendant and the union.  Because plaintiff had surgery on his right shoulder in September 2003 and was not released to return to work until August of 2004, the deadlock panel hearing was not held until August 19, 2004.  Plaintiff and defendant's labor relations manager, Debbie Applegate ("Applegate"), testified before the deadlock panel regarding plaintiff's termination.  The deadlock panel reduced plaintiff's termination to a seven-day unpaid suspension and ordered plaintiff to attend a one-day training at his own expense.

Due to a non-work related surgery to his foot in 2004, plaintiff did not return to work until January 10, 2005.  Upon his return, plaintiff spent the entire day without pay viewing videos, taking tests and observing various demonstrations in compliance with the deadlock panel decision.

The following day, January 11, 2005, Richard Gray ("Gray"), health and safety manager, and Ken Glaus, human resources manager, met with plaintiff to discuss a Re-Injury/Re-Auto Accident Prevention Review Plan.  Plaintiff signed a commitment to work safely and defendant committed to notify plaintiff of any observed violations.

Also pursuant to the re-injury plan, another safety ride was conducted.   The safety ride was performed by Greg Taylor ("Taylor"), one of plaintiff's supervisors, on January 11, 2005.  During the ride, Taylor trained plaintiff on safe work methods, which including lifting and handling packages.  He also conducted additional safety training on January 12, 2005.

On February 21, 2005, plaintiff reported another injury to his back.  Because plaintiff did not report the injury on the day the injury occurred, Halley Price ("Price"), the new Edmond Center manager, issued a warning letter to plaintiff.  Price also had Taylor conduct another safety ride with plaintiff upon his return to work on February 25, 2005.

In early March, 2005, plaintiff, pursuant to the collective bargaining agreement, bid on and received his own delivery route due to his seniority level.

On March 10, 2005, Price asked Gray to accompany him to observe plaintiff. Price and Gray allegedly observed various safe work methods violations. The following Monday, March 14, 2005, Price did not inform plaintiff of the March 10 observations. Instead, Price demonstrated each activity he and Gray had observed plaintiff violate. He asked plaintiff whether he was using safe work methods. Plaintiff indicated that he was and would continue to use safe work methods. In addition, plaintiff requested management to come to him if they saw him doing something wrong. Plaintiff's comments were recorded on the Re-Injury/Re-Auto Accident Prevention Review and Employee Injury/Accident Prevention Plan form. Plaintiff was also asked to sign the form.

Later that day, Price and John Richman ("Richman"), comprehensive health and safety process manager, conducted another observation of plaintiff. Price and Richman purportedly witnessed safe work methods violations. Price documented the safe work method violations on a safety ride form. Price met with plaintiff on the morning of March 15, 2005, but did not tell him of the observations the previous day. Instead, he demonstrated the various lifting methods plaintiff had not followed and then had plaintiff commit to following defendant's safe work methods.

At the request of Price, a security supervisor, Jimmy Guadalupe ("Guadalupe"), performed a third on-area observation of plaintiff on March 15, 2005. After receiving Guadalupe's feedback as to alleged violations, Price presented the results of all three observations to Applegate, the labor relations manager, and Joe Mullet ("Mullet"), division manager. Applegate told Price to discharge plaintiff.

On March 16, 2005, Price met with plaintiff in the presence of Guadalupe and two union representatives. Price advised plaintiff that he had been observed on three

different days, and over the course of those days, he had committed over 195 unsafe acts.  Price also stated that because of the unsafe acts, defendant was terminating his employment.  A termination letter, dated March 22, 2005 and signed by Mullet, stated that plaintiff was terminated, effective March 16, 2005, for failure to follow safe work methods.

Plaintiff filed a grievance over the termination.  Defendant and the union were unable to reach an agreement on the local level.  The grievance was then heard by the grievance panel on April 20, 2005. The grievance panel upheld the termination for violating safe work methods.  At that point, plaintiff was officially discharged from his employment.

Discussion

A.    Section 1981 retaliation claim

Initially, plaintiff brings a claim against defendant under § 1981 alleging that he was retaliated against based upon his prior action against defendant.  The jury verdict on plaintiff's claims of race discrimination and retaliation under Title VII and § 1981 was returned in September 2002.  As plaintiff has no direct evidence of retaliation, his § 1981 retaliation claim is analyzed using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). *See*, Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006).  Under the McDonnell Douglas framework, plaintiff has the initial burden of establishing a prima facie case of retaliation.  *Id*.  If he establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for taking the adverse employment action.  *Id*.  If the defendant succeeds, the burden shifts back to plaintiff to demonstrate that defendant's proffered reason for its employment decision is pretextual.  *Id.*

To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between his opposition and the employer's adverse action. Antonio, 458 F.3d at 1181.

In its motion, defendant does not challenge plaintiff's ability to establish the first element of the prima facie case, that is, he engaged in protected opposition to discrimination. Rather, it challenges plaintiff's ability to establish the other two elements, that plaintiff suffered an adverse action and that there is a causal nexus between plaintiff's opposition to discrimination and the adverse action. According to defendant, the alleged interference with plaintiff's physicians appointments, which occurred in January, March, April and June of 2003, does not constitute an adverse action for purposes of the prima facie case. Defendant contends that while plaintiff might have been inconvenienced by the alleged interference, the alleged interference did not affect his employment status. Specifically, defendant argues that a reasonable employee would not have been dissuaded from making a discrimination complaint based upon the alleged interference. In addition, defendant asserts that plaintiff cannot show a causal nexus between his employment discrimination trial and any of the discipline imposed in 2003 and 2005. Defendant contends that plaintiff cannot rely upon temporal proximity between the trial and the challenged discipline to establish the causation element because events were temporally too far apart, under Tenth Circuit precedent, to warrant an inference of retaliation. Further, defendant contends that plaintiff has not proffered other evidence from which causation can be inferred. According to defendant, the record fails to show any evidence that plaintiff was treated differently than other similarly situated package car drivers.

Plaintiff, in response, contends the interference with his doctor's appointments constitutes adverse action because it resulted not only in interference with physician

appointments but also resulted in a loss of compensation and vacation/holiday days, which he had to grieve. Plaintiff contends that a reasonable package car driver would have been dissuaded from opposing discrimination when, after returning from an employment discrimination trial, he was immediately denied his right to compensated court-ordered doctor appointments. In addition, plaintiff contends that on the issue of causation, the retaliatory acts by defendant cannot be viewed in isolation. Plaintiff asserts that within seven months of his return to work, defendant had interfered with physician appointments, had issued several warning letters, had suspended plaintiff for one day, and had terminated plaintiff twice. Then after two terminations were reduced and plaintiff returned to work upon release from a non-related work injury, defendant issued another warning letter and then terminated him again.

The court concludes, for summary judgment purposes, that plaintiff can establish the second element of the prima facie case of retaliation. Defendant does not assert that the warning letters issued by Ross in April, 2003, and July, 2003, the warning letter issued by Schmidt in June of 2003, the suspension for one day issued by Ross in May, 2003, the two terminations issued by Ross in July and August, 2003, the warning letter issued by Price in February 2005, and the termination issued by Price, Applegate and Mullett, in March 2005, constitute adverse action. The only challenge is on the issue of whether the interference by Ross with plaintiff's physician appointments in January, March, April and June of 2003 constitutes adverse action. The court, however, need not decide whether the interference with plaintiff's physician appointments in January, March, April and June of 2003 constitutes an adverse action. The court assumes without deciding, for purposes of summary judgment, that the interference, which resulted in a loss of pay and vacation/holiday days for a period of time, constitutes adverse action under <u>Burlington Northern & Santa Fe Railway Company v. White</u>, 126 S.Ct. 2405, 2415 (2006) ("a plaintiff must

show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotations omitted)).

Plaintiff having established the first and second elements, the court now turns to the third and final element, a causal nexus between the opposition to discrimination and the employer's adverse action. Upon careful review of the record, the court concludes that plaintiff has failed to present sufficient evidence to raise a genuine issue of fact as to whether there is a casual nexus between the opposition to discrimination and the challenged discipline. The court recognizes that under Tenth Circuit authority, an employee "'may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Antonio, 458 F.3d at 1181 (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239-1240 (10th Cir. 2004)). The court also recognizes that the Tenth Circuit has concluded that temporal proximity should not be viewed too restrictively where a pattern of retaliatory conduct begins soon after the protected activity and only culminates later in an actual discharge. Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996). Plaintiff has shown that immediately upon his return to work, he suffered adverse action by Ross in January 2003 with the interference with physician appointments. This continued in March and April of 2003 as well as June of 2003. He has also shown a warning letter issued by Ross in April 2003, a suspension of one day issued by Ross in May of 2003 and then two terminations by Ross in July and August of 2003. However, what plaintiff has failed to show and what the court, upon careful review of the record, has not found, is any evidence to show that Ross, who imposed the challenged discipline, knew of or was aware of the September 2002 trial. In order to establish a causal connection between his protected activity and defendant's adverse employment

actions, "plaintiff must show that the individual who took adverse action against him knew of [plaintiff's] protected activity." Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993). The evidence presented by defendant establishes that Ross was not the manager of the Edmond Center at the time of plaintiff's trial. He worked for defendant as an audit manager in Oklahoma City. Ex. 46, ¶ 2, Declaration of Michael Sourie, defendant's motion; Ex. 1, Declaration of Rick Ross, defendant's supplement exhibit. Ross did not become manager in the Edmond Center until January 2003, the month plaintiff also returned to work from his work-related injury. Plaintiff has not produced any evidence that Ross knew of plaintiff's opposition to discrimination. In the absence of such evidence, the court concludes that plaintiff has failed to raise a genuine issue of fact as to whether there is a causal link between his opposition to discrimination and the adverse actions issued by Ross. Williams, 983 F.2d at 181 (affirming summary judgment on retaliation claim due to employee's failure to provide any evidence that supervisor knew of employee's protected activity).

Plaintiff has also pointed to a warning letter issued by Schmidt in June, 2003. There is evidence in the record that Schmidt was a supervisor at the Edmond Center during plaintiff's trial. Ex. 48, p. 52, defendant's motion. However, plaintiff cannot show temporal proximity between (i) his activities in opposition to discrimination and (ii) this adverse action because the warning letter was issued approximately five months after his return to work in January of 2003. The warning letter five months after his return to work is too temporally remote to support an inference of causation. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) (observing that "a three-month period, standing alone, is insufficient to establish causation"). Without very close temporal proximity between the protected activity and the alleged retaliatory conduct, plaintiff must offer additional evidence to establish causation. Id. The court concludes that plaintiff has not presented sufficient additional evidence to

demonstrate a causal connection between the warning letter issued by Schmidt in June 2003 and plaintiff's opposition to discrimination.

The remaining adverse actions challenged by plaintiff occurred in 2005. Plaintiff was issued a warning letter by Price for failure to follow directions in February 2005, a month after he returned to work from a non-related work injury. He was terminated by Price, Applegate and Mullet in March of 2005, which decision was upheld by the grievance panel in April of 2005. The record reflects that Price, Applegate and Mullet did not have any connection with the Edmond Center at the time of plaintiff's trial. In his briefing, plaintiff asserts that Price demonstrated "his knowledge of Plaintiff's 2002 trial," *see*, p. 23, plaintiff's response, by stating to plaintiff on February 22, 2005 that "he heard that I was done wrong by managers in the past and that had left a sour taste in my mouth with regards to the company and he just want[ed] me to work safe and we [would] be fine." Ex. 19, p. 6, plaintiff's response. The court, however, concludes that this statement, even when viewed in a light most favorable to plaintiff, does not demonstrate that Price knew of or was aware of plaintiff's opposition to employment discrimination. The court concludes that a reasonable jury could not conclude from this statement that Price knew that plaintiff had filed a complaint against defendant for race discrimination and retaliation. Plaintiff also points to the affidavit of a co-worker, Eric Parker ("Parker"), wherein Parker states that he testified in plaintiff's trial in 2002 and was terminated by Price in June of 2004. Parker states that he believes his discharge for alleged "dishonesty" was directly related to his having testified for plaintiff because he did not behave dishonestly and management did not provide a legitimate basis for his termination. Parker's affidavit, however, fails to provide any evidence that Price knew of plaintiff's trial and knew that Mr. Parker testified in the trial. The court concludes that Parker's

affidavit evidence fails to raise a genuine issue of fact as to whether Price knew of or was aware of plaintiff's opposition to discrimination.

The record is also devoid of any evidence to demonstrate that Applegate and Mullet were aware of plaintiff's activities in opposition to discrimination. The record evidence shows that neither employee worked at the Edmond Center at the time of plaintiff's trial or shortly thereafter. Indeed, these employees were working for defendant in a state other than Oklahoma at the time of plaintiff's trial. In the absence of evidence showing that Price, Applegate and Mullet were aware of plaintiff's opposition to discrimination, the court concludes that plaintiff has failed to raise a genuine issue of fact as to whether there is a causal link between his opposition to discrimination and the adverse actions taken by Price, Applegate and Mullet. Williams, 983 F.2d at 181.

Even if the court were to conclude that a reasonable jury could find that the statement of Price indicated knowledge of plaintiff's opposition to discrimination, the court concludes that plaintiff has failed to present evidence sufficient to raise a genuine issue of material fact as to the third element of plaintiff's prima facie case.

Because plaintiff cannot show that his March 2005 termination closely followed his September 2002 trial, he cannot establish causation by temporal proximity. Consequently, plaintiff must offer additional evidence to establish the necessary casual connection between his opposition to discrimination and his termination. Antonio, 458 F.3d at 1182. Plaintiff proffers Price's statement and Parker's discharge as additional evidence in support of causation. Plaintiff also proffers evidence that he claims demonstrates the weakness of defendant's reason for his discharge, thereby creating a genuine issue of material fact as to whether defendant's reason for plaintiff's discharge is a pretext for discrimination. Although the latter evidence is typically considered during the third phase of the McDonnell Douglas inquiry,

plaintiff correctly points out that the Tenth Circuit has considered evidence of pretext in evaluating the prima facie case in the context of a retaliation claim. Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1317 n. 7 (10th Cir. 2006).

The court concludes that evidence as to Price's statement and Parker's discharge does not raise a genuine issue of fact as to whether there is a causal nexus between plaintiff's September 2002 trial and his March 2005 termination. Although Price's statement was purportedly made within a month of plaintiff's termination, the statement does not support an inference of causal nexus. Even if the statement, as argued by plaintiff, established knowledge by Price of plaintiff's opposition to discrimination, the statement does not show that Price terminated plaintiff on the basis of his opposition to discrimination. As to Parker's termination, the court also concludes that such termination does not support an inference of causation. While Parker states in his affidavit that he believes his June 2004 firing by Price was directly related to his having testified for plaintiff in the September 2002, he fails to provide any evidence to support his belief. Indeed, he fails to provide any evidence that Price knew he testified in plaintiff's trial. In the absence of any evidence that Price knew Parker testified on behalf of plaintiff in his trial, the court concludes that Parker's testimony is not sufficient to raise a genuine issue of fact as to the causation element.

In its briefing, defendant proffers that plaintiff was terminated in March 2005 because he violated work safety methods. Plaintiff contends that defendant's reason is unworthy of credence and is a pretext for retaliation. To establish pretext, plaintiff must present "evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons." Antonio, 458 F.3d at 1183.

16

As evidence of pretext, plaintiff asserts that plaintiff's safe work methods were not a significant issue to defendant until after his September 2002 trial. However, the record demonstrates that plaintiff had different supervisors after his trial. Pretext cannot be inferred from defendant's different treatment of plaintiff where the alleged differing treatment occurred at that hands of different supervisors, that is treatment by his supervisors prior to trial as compared to his treatment by supervisors after trial. The reasons for this is because the difference in treatment may be the result of a different supervisor's reactions. *See*, Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1175-76 (10th Cir. 2006).

Plaintiff also asserts that at the grievance panel hearing addressing his March 2005 termination, defendant argued that while plaintiff violated over 195 safety work methods, "the biggest offender of all this is the cell phone." Ex. 35, p. 10, l. 1-2, plaintiff's response. Plaintiff argues, however, that defendant did not have a written policy prohibiting or limiting cell phone use.[2] According to plaintiff, defendant encouraged the use of cell phones for calling other drivers on routes and to set-up meet times with customers to obtain delivery or pick-up help.

The evidence in the record, however, does not show that management faulted plaintiff for mere use of a cell phone. On March 14, 2005, plaintiff was observed picking up a package with one hand while talking on the cell phone. He was observed on March 15, 2005 loading and unloading his hand truck with one hand while talking on the cell phone. Defendant pointed out at the grievance panel hearing that "[plaintiff'] committed he's going to follow the methods and he can't follow the methods, proper lifting, exiting, handling, the cart, while he's on the cell phone and

---

[2]   The court notes that in his deposition, plaintiff admitted that he had been told by management that he was not to use a cell phone while driving. Ex. 1, p. 112, ll. 21-25; p. 113, ll. 17-25.

he did that numerous times." Ex. 35, p. 10, ll. 3-6, plaintiff's response.  By picking up packages or loading and unloading with a cell phone in his hand, plaintiff failed to follow the safe work methods on which he had been trained.  Plaintiff admitted during his deadlock panel hearing for his 2003 terminations that exiting his vehicle with a cell phone on his ear and package in his hand would not be a safe work method.  Ex. 25, p. 33, ll. 23-26, defendant's motion.  The court concludes that the absence of a written policy prohibiting or limiting the use of cell phones does not lead to an inference that defendant's termination decision was pretextual.

Plaintiff also asserts that a review of the documentation supporting his discharge reveals serious weaknesses in defendant's employment decision.  Plaintiff contends that the more than 195 violations of safe work methods were documented by management, over three days, at a shopping mall, without the use of objective evidence, such as photography or video recording.  The shopping mall would not permit the use of photographic or video recording devices.  Plaintiff contends that defendant could have easily observed plaintiff at another site where photographic or video recording devices could have been used. Plaintiff, however, has not presented any authority which requires an employer to record safe work violations in order to support a termination nor has he submitted any authority that failure to use recording devices raises an inference of pretext.  The court notes that while plaintiff was observed by Price on two of the three days of observation, a different employee also accompanied Price on those two days and signed off on the memorandum addressing the observations.  And on the third day, another employee observed plaintiff with Price not present.  Moreover, as Gray testified in regard to his observation,

> So if you're trying to follow somebody and they basically look in their mirror and they can see you, they might change their habits so to speak, but in the mall, you know, we were able to observe because there's so

many people walking and going, you are able to observe quite a few instance of lifting and lowering and other observations.

Ex. 8, p. 29, ll. 19-25, defendant's motion.

Plaintiff further contends that the documentation in regard to the March 2005 termination contains an implausible statements by Guadalupe and Price, such as "towards the end of my observations [plaintiff] noticed that I was observing him . . . his methods became perfect, but once I was out of sight [plaintiff's] methods became poor again" and "plaintiff could not make one delivery without an unsafe act." Exs. 34, 36, plaintiff's response. The court, however, concludes that these statements, along with the fact that over 195 safe work methods were reported as being violated over a three-day period, are not sufficient to create a genuine issue of material fact as to whether defendant's termination of plaintiff was pretextual. The court concludes that such evidence does not "call into question the honesty or good faith of [defendant's] assessment of [plaintiff's performance]." Exum v. United States Olympic Comm., 389 F.3d 1130, 1137-38 (10th Cir. 2004).

As further evidence of pretext, plaintiff points to the fact that fifteen other package car drivers had to miss work due to plaintiff's prior lawsuit. There is no evidence in the record, however, to show that Price, Applegate or Mullet knew that fifteen workers had to miss work to testify at plaintiff's trial. Even if the statement by Price on February 22, 2005 might show knowledge of plaintiff's opposition to discrimination, it does not demonstrate knowledge that fifteen employees were required to miss work as a result of the opposition. The court thus concludes that this evidence is insufficient to establish pretext.

Finally, plaintiff contends that his March 2005 termination was inconsistent with defendant's commitment in its "Re-injury/Re-Auto Accident Prevention Review Employee Injury/Accident Prevention Plan" and its "standard rule" in regard to on-

area observations.  Plaintiff contends that the record reveals that the re-injury plan into which plaintiff had been indoctrinated was to continue until April of 2005, at which time plaintiff would receive a progress review.  Plaintiff asserts that under defendant's plan, employees were to be informed that they would be observed and they were to be provided feedback on the same day as the observation.  Plaintiff also contends that as to on-area observations, defendant's standard rule, as confirmed by Price in his testimony, was that employees were to be given feedback on the day after the observations.  Plaintiff contends that the record shows that he was not informed that he was to be observed by management on March 10, 14 or 15 and feedback was not provided by management until he was terminated.

The uncontradicted testimony in the record indicates that plaintiff was not observed on March 10, 14, and 15, 2005 as part of the re-injury plan.  Although the record indicates that a re-injury plan form was used by Price to document the discussions with plaintiff after the March 10 observation, the court concludes that such evidence, in and of itself, does not raise a genuine issue of fact as to whether defendant failed to comply with its commitment under the plan.  Similarly, the court concludes that the fact that Price did not follow the standard rule of feedback is not sufficient to demonstrate pretext.  "The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual."  Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995) (emphasis omitted).  Moreover, the court notes that plaintiff has not presented any evidence to show that he was treated differently than similarly situated persons.

Plaintiff also points to the fact that the violations for which he was terminated were significantly different than those alleged in the previous terminations, which plaintiff had worked to correct.  Although the safe work methods violations which led

to the March 2005 termination were not the same as those involved in the previous terminations, the record reflects that plaintiff had been given specific instructions in his safe work methods training on lifting, gripping and pivoting techniques. Exs. 10, 11, 14, 31, plaintiff's response, Ex. 20, defendant's motion. He also had specific training on his return to work in January 2005 as to lifting and lowering, gripping, getting close to packages and pivoting. Exs. 27, 29, 31, defendant's motion. Moreover, his termination was by a different supervisor. The court concludes that the fact that plaintiff was terminated for safety violations that differed from those which had earlier been at issue does not raise a genuine issue of material fact as to whether defendant's reason for his discharge was pretextual.

In sum, the court concludes that the evidence plaintiff proffers fails to establish the causation element of a prima facie case of his retaliation claim. Nonetheless, even if the court were to assume that plaintiff could establish a prima facie case, the court concludes that the evidence in its totality does not raise a genuine issue of material fact regarding the third step of the McDonnell Douglas framework, that is, whether defendant's proffered reason is a pretext for retaliation. Proctor v. U.P.S., ____ F.3d ____, 2007 WL 2705344 * 9 (10th Cir. September 18, 2007) (assuming plaintiff established prima facie case but holding totality of evidence does not raise a genuine issue of material fact regarding pretext). As the court's discussion of plaintiff's evidence regarding pretext demonstrates, plaintiff has not created a genuine issue of material fact as to whether defendant's proffered reason is unworthy of credence. The court therefore concludes that summary judgment is appropriate as to plaintiff's retaliation claim under § 1981.

Oklahoma Workers' Compensation Act Claim

Having found that summary judgment is appropriate on plaintiff's federal law claim, the court must determine whether to exercise supplemental jurisdiction over plaintiff's remaining state law claim.  Judicial economy, fairness, convenience and comity are all considerations that are to guide a district court's decision whether to defer to a state court rather than retaining and disposing of state law claims.  United Mine Workers v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).  However, the Tenth Circuit has held that when the federal claim is resolved before trial, the district court should usually decline to exercise jurisdiction over the state law claim and allow the plaintiff to pursue the claim in state court.  *See*, Smith v. City of Enid By and Through Enid City Com'n, 149 F.3d 1151, 1156 (10th Cir. 1998); Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995).  Having disposed of the federal law claim prior to trial and finding no consideration requiring the court to retain and dispose of plaintiff's state law retaliatory discharge claim,[3] the court, in its discretion and pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over plaintiff's retaliatory discharge claim under the Oklahoma Workers' Compensation Act, 85 O.S. § 2001, § 5(A).  The court shall dismiss the state law claim without prejudice.

---

[3] Section 100 of Title 12 of the Oklahoma Statutes Annotated  provides in pertinent part:

> If any action is commenced within due time, and a judgment for the plaintiff is reversed, or if the plaintiff fail in such action otherwise on than upon the merits, the plaintiff . . . may commence a new action within one (1) year after the reversal or failure although the time limit for commencing the action shall have expired before the new action is filed.

12 O.S.A. § 100 (2000).  "Section 100 applies to extend the limitations period regardless whether the dismissed suit was filed in state court or federal court sitting within the state of Oklahoma."  Grider v. USX Corp., 847 P.2d 779, 738 (Okla. 1993).

Based upon the foregoing, the defendant, United Parcel Service, Inc.'s Motion for Summary Judgment, filed on June 29, 2007 (doc. no. 42), is **GRANTED** to the extent it seeks summary judgment on plaintiff's retaliation claim under 42 U.S.C. § 1981.

As to the remaining state law claim of retaliatory discharge under the Oklahoma Workers Compensation Act, 85 O.S. 2001 § 5(A), the court, in its discretion and pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the state law claim and **DISMISSES WITHOUT PREJUDICE** the state law claim. Judgment shall issue forthwith.

ENTERED this 5th day of October, 2007.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


06-0850p016(pub).wpd

23